BymgJERRY KAPLAN, ESQ., CA Bar No. 49142
JOSEPH BENINCASA, ESQ., CA Bar No. 251347
KAPLAN, KENEGOS & KADIN
Attorneys at Law
9150 Wilshire Boulevard, Suite 175
Beverly Hills, California 90212

Telephone:  (310) 859-7700
Facsimile:  (310) 859-7773
Email:  kapkenkd@pacbell.net

Attorneys for Defendant
TIGRAN SARKISYAN

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. CR-11-0072-49-DDP |
| | ) | |
| Plaintiff, | ) | |
| | ) | **DEFENDANT'S SENTENCING** |
| vs. | ) | **MEMORANDUM** |
| | ) | |
| | ) | |
| | ) | Date: February 20, 2014 |
| TIGRAN SARKISYAN, et al., | ) | Time: 2:30 p.m. |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**I.**

**INTRODUCTION**

The defendant, TIGRAN SARKISYAN, pleaded guilty to a one count information on September 12, 2013, for extortion, 18 U.S.C. §1951(a).  Mr. Sarkisyan has been released on Bond for three years and has no violations of his release.  He has been given permission by this Court to travel and his supervision level was reduced based on his good performance on release.

Defendant opposes the recommended sentence of 21 months put

1

**DEFENDANT'S SENTENCING MEMORANDUM**

forth by the Presentence Report ("PSR") and accepted by the government, and requests a sentence of probation or home detention for the following reasons:

1.  Defendant committed the crime under extraordinary circumstances, that is, his sister was dying of cancer and he was trying to get money that was owed to him by the victim in order to pay for her treatment.

2.  Defendant should be sentenced as if he has a criminal history category I because his misdemeanor convictions are thirteen (13) years old and reliable evidence shows that they substantially over-represent the seriousness of his criminal history and the likelihood that he will commit other crimes; the convictions were eligible for expungement as a matter of law and if they had been expunged, they would account for zero criminal history points; and Mr. Sarkisyan was not given jail time for his prior convictions as indicated in the PSR.

3.  The factors pursuant to 18 U.S.C. 3553(a) show this to be an exceptional person who acted in a manner aberrant with his peaceful and law abiding nature; he is an important financial and emotional support to his family and children, particularly after the death of his sister, and they will suffer unnecessarily if he is incarcerated; and Mr. Sarkisyan has demonstrated good conduct and reform since his arrest three years ago such that the court should sentence the defendant to probation or home detention.

2

**DEFENDANT'S SENTENCING MEMORANDUM**

## II.

### FACTS

Before the court is 38-year-old Flower Shop owner Tigran Sarkisyan.  He was born in Armenia and lived there until his parents moved to the United States in 1988, when he was 12.  He has lived in Southern California for the last 26 years.  When he was young he excelled in gymnastics and made the Olympic trials, but was ineligible to compete due to his immigration status.  He is now a United States citizen.

Mr. Sarkisyan lost his father to a brain tumor 10 years ago but is still close with his mother, who lives in Woodland Hills, and he sees her every day.  Mr. Sarkisyan lives with his current partner of nine (9) years, Ripa Khachatryan, with whom he has one daughter, aged 9.  Mr. Sarkisyan has two other children, ages 14 and 11, who live with his ex-wife, Lusik Ayrazyan, and who he sees at least once per week.  He pays $800.00 per month in child support and remains on excellent terms with Ms. Ayrazyan (see attached letter and declaration).  Mr. Sarkisyan is close with all his children and takes his familial obligations very seriously.  As shown by the attached letters of support, he is a cherished member of his family and community.

Mr. Sarkisyan has two prior misdemeanor convictions which both occurred withing 6 weeks of one another 14 years ago.  Mr. Sarkisyan and his wife at the time, Ms. Ayrazyan, had a one year old baby at home and were experiencing marital problems that led to their eventual divorce.  As is apparent from Ms. Ayrazyan's letter and declaration, although they were not a good couple, Ms.

3

**DEFENDANT'S SENTENCING MEMORANDUM**

Ayrazyan loves and respects Mr. Sarkisyan as a man and as the father of their two children.  The misdemeanor convictions from that time are for Solicitation and Domestic Violence, respectively.  The domestic violence conviction is particularly troubling to defense counsel since Ms. Ayrazyan declares under penalty of perjury that Mr. Sarkisyan never in his life laid hands on her.  Because it is a misdemeanor over 10 years old, counsel has been informed that the file was destroyed.  These convictions are discussed in more detail below.

Since 2000, when Mr. Sarkisyan was placed on probation (which he completed without incident) Mr. Sarkisyan led a law abiding life.  He opened his flower shop in 1998 and has run that business since that time.  He separated with Ms. Ayrazyan in 2004 but the split was amicable.  Mr. Sarkisyan became relatively well known in the tight Armenian community in Glendale through his flower shop and universally respected by all who know him.  Unfortunately, that tight community also included some less desirable individuals, including the victim in this case and the co-defendant.

Sometime in late 2008 or early 2009, The victim, G.A., a gold "merchant", convinced Mr. Sarkisyan to loan him a large sum of money.  G.A., of whom it was later revealed defrauded a large number of individuals, did not repay the money.  G.A. continually sought to delay collection and was continually offering new excuses and promises to repay.  While Mr. Sarkisyan was clearly unhappy that he had been taken advantage of, he did not seek to have his money returned by force (because he morally objects to

**DEFENDANT'S SENTENCING MEMORANDUM**

1  the use of violence) nor did he seek to use the courts, in part
2  due to the cultural beliefs of the Armenian community and his
3  upbringing, and was somewhat resigned to the fact that he would
4  probably never see that money again.

5      Mr. Sarkisyan's life changed dramatically following the
6  diagnosis and treatment of his older sister's stomach cancer.
7  Lilia Sarkisyan was his only sibling.  He was extremely close to
8  her and to her husband and children.  To this day they view him
9  as a second father and the rock of his extended family.  When Mr.
10  Sarkisyan learned of his sister's diagnosis and the high cost of
11  necessary treatment, he and his family pooled their resources and
12  made every possible sacrifice to pay for the treatments.
13  Unfortunately, in what is an all too common reality for many
14  families in our healthcare system, their sacrifices were not
15  enough.  They could not come up with the money necessary to pay
16  for the treatments.  Every day, Mr. Sarkisyan visited with his
17  sister, comforted her, helped care for her children, cleaned her
18  sheets, and watched her slowly dying before his eyes.

19      Mr. Sarkisyan was speaking with the co-defendant one day,
20  who was an acquaintance but not a close friend, about the
21  difficulties he was having with paying for the treatments and how
22  frustrated he was that he could not recoup the money from G.A. at
23  a time when he really needed it for his sister.  This co-
24  defendant, who Mr. Sarkisyan knew had considerable criminal
25  stature, offered to "help" Mr. Sarkisyan get his money back.

26      Mr. Sarkisyan reasoned that he was not asking anyone to
27  steal money from G.A. for him, he was just trying to get back the
28

money that was rightfully owed to him.  There was nothing he
wouldn't do to save his sister.  He was desperate to help her and
stop the impending pain and suffering that grew every day.
Although he knew it was wrong and was a violation of law, he told
his co-defnedant to go ahead and see what he could do.  On
November 25, 2009, Mr. Sarkisyan gave his co-defendant a ride to
meet with G.A. and then returned to his flower shop and waited.

His co-defendant use threats of force to extort money from
G.A., which wiretaps then show his co-defendant actually intended
to keep for himself.  Mr. Sarkisyan never saw a cent from G.A. or
his co-defendant.  Mr. Sarkisyan borrowed $12,500.00 from his
friend, defense counsel (who was not his counsel at the time),
which he has since paid back.  Mr. Sarkisyan used that money for
the cancer treatments for his sister.  Unfortunately, the
treatments were not enough to save Lilia, and she died a little
over two years ago.  Mr. Sarkisyan and his family were
devastated.

Mr. Sarkisyan has cooperated with authorities since his
arrest.  He has performed perfectly on supervised released,
despite the fact that his second business has essentially ceased
operations due to his travel restrictions (prior to his arrest he
had opened a tequila import business, which required regular
travel to Mexico).  His family stands by him and have offered
letters of support.  His children, and the children of his
sister, rely on his presence in their lives both financially and,
more importantly, emotionally after the loss of their mother.
His own mother is desperate knowing that so shortly after losing

her daughter, she may now lose her son to prison.  While no one condones what he did, in their hearts they understand it and are grateful that he was willing to go to such lengths for Lilia.  He is an honorable and compassionate, yet flawed human being.  But there is little question that his motivation was pure.

Defendant prays the court will sentence him to either probation or home detention so that he can continue to work and care for his family.  He is a strong man and while he would certainly prefer to not be in prison, he will tolerate it.  His children and the children of his dead sister, however, will suffering immeasurably more from his absence.

### III.

### DEFENDANT'S PRIOR CONVICTIONS OVER-REPRESENT THE SERIOUSNESS OF HIS CRIMINAL HISTORY AND HE SHOULD BE SENTENCED AS IF HE HAS A CRIMINAL HISTORY CATEGORY OF I

The PSR report gives Mr. Sarkisyan 3 criminal history points, resulting in a criminal history Category II.  The two misdemeanor convictions which provide these three points substantially overstate his criminal history and a downward departure is necessary to correct this over-representation, pursuant to U.S.S.G. §4A1.3(b)(1).  That section calls for a downward departure of defendant's criminal history category (not offense level) "if the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes."  Mr. Sarkisyan's criminal history both overstates

7

**DEFENDANT'S SENTENCING MEMORANDUM**

1  the seriousness of his prior misdemeanors and the likelihood that

2  he will re-offend.

3  **A.   One Point For Defendant's May 24, 2000 Conviction for**

4        **Solicitation, Case No. 0GL02712.**

5        First, the PSR incorrectly notes the conviction as

6  "Prostitution w/ Prior," however, there was not a prior alleged,

7  there was no prior conviction, and it is not included in the

8  statute of conviction, California Penal Code §647(b), Disorderly

9  conduct.  Likely this was simply an error in the PSR.  The full

10 docket report of this conviction is attached.

11       The conduct for this conviction occurred fourteen (14) years

12 ago, when defendant was 25 years old.  The conviction occurred

13 nine years and two months prior to the conduct at bar, or just 10

14 months short of being beyond the time limitation in U.S.S.G.

15 §4A1.2(e)(2) and counting for zero points in Mr. Sarkisyan's

16 criminal history calculation.

17       Further, Mr. Sarkisyan completed his 36 months probation

18 without any probation violations.  Under California Penal Code

19 §1203.4, Mr. Sarkisyan was therefore entitled to have his

20 conviction expunged as a matter of law.  Had he done so after

21 2003, this conviction would also count for zero criminal history

22 points.  U.S.S.G. §4a1.2(j).

23       This conviction was a result of Mr. Sarkisyan being

24 propositioned by an undercover officer posing as a prostitute.

25 While Mr. Sarkisyan's affirmative response was illegal, it is a

26 stretch to say that his criminal history point for a solication

27 conviction 14 years ago accurately represents his criminal

28

**DEFENDANT'S SENTENCING MEMORANDUM**

1   background.  This point, while technically accurate, grossly

2   overstates his true criminal history and disposition.

3   **B.   Two Points for Defendant's March 23, 2001, Conviction for**

4   **Domestic Violence, Case No. 1CR04810**

5      Mr. Sarkisyan's only other conviction results in two

6   criminal history points, according to the PSR.  This is error.

7   The PSR assigns two points for this misdemeanor conviction,

8   instead of one point, because the PSR assumed that Mr. Sarkisyan

9   was sentenced to 60 days in jail.  However, Mr. Sarkisyan was

10  actually sentenced to 45 days of community labor (Caltrans or

11  Graffiti removal) *or* 60 days in jail.  Mr. Sarkisyan never served

12  a day in jail and completed his probation without incident.

13     U.S.S.G. §4A1.1(b) states that 2 points should be added for

14  sentences of "at least 60 days."  Since Mr. Sarkisyan was given

15  the option for incarceration and chose to do community labor

16  instead, the conviction should be counted as one point under

17  U.S.S.G. §4A1.1(c).  "If part of a sentence of imprisonment was

18  suspended, 'sentence of imprisonment' refers only to the portion

19  that was not suspended."  U.S.S.G. §4A1.2(b)(2).  In this

20  conviction, imposition of sentence was suspended and Mr.

21  Sarkisyan was permitted to do jail time or community labor.  He

22  chose the latter and therefore the sentence of imprisonment was

23  suspended.  The conviction should only count for one point.

24     More important than the debate regarding Mr. Sarkisyan's

25  point count for this conviction, however, is the fact that he

26  didn't commit the crime to begin with.  Attached to this

27  Memorandum is a declaration under penalty of perjury from the

28

**DEFENDANT'S SENTENCING MEMORANDUM**

"victim" in that case, Mr. Sarkisyan's ex-wife, Lusik Ayrazyan. Ms. Ayrazyan states that Mr. Sarkisyan never struck her.  Nearly fourteen (14) years ago, on the night of the incident, July 8, 2000, the married couple were loudly arguing and a neighbor called the police.  Police investigated but did not arrest Mr. Sarkisyan.  Ms. Ayrazyan told police that he never laid a hand on her and she had no signs of injury.

For some reason counsel can not determine from the record, the case was filed seven months later in February of 2001.  Mr. Sarkisyan hired an attorney to represent him, and, according to Mr. Sarkisyan and Ms. Ayrazyan, the attorney informed them that he had received a plea deal wherein Mr. Sarkisyan could simply do community labor and take a domestic violence class and the case would be dismissed.  Mr. Sarkisyan never even knew that the 60 day jail sentence was an option, or, further, that he would be on probation for three years (even though he completed the three years probation without incident).

This misunderstanding of his plea is bourne out in the docket report, wherein counsel for Mr. Sarkisyan apparently moves for termination of probation once Mr. Sarkisyan completes his classes and labor, and then Mr. Sarkisyan files a request to expunge the conviction.  The case was transferred to another department and the motions were denied, possible due to a new judge not remember the original agreement.  In any event, a request for expungement was never refiled.  As mentioned above, had an expungement request been refiled, he would have been granted expungement as a matter of law and this misdemeanor

**DEFENDANT'S SENTENCING MEMORANDUM**

conviction would account for zero criminal history points.

The conduct for this conviction occurred 9 years and 4 months prior to the conduct for the case at bar (and only six weeks after Mr. Sarkisyan was arrested for solicitation).  During that time, Mr. Sarkisyan was working to support his one-year-old baby and new wife.  He was clearly under stress and did not possess the maturity or foresight to always make the best decision.  He got in a disturbing shouting match with his wife and the police were called.  He then either misunderstood or was mislead by his attorney and the result is that he has an old conviction that pushes him into criminal history category II.

It is difficult to imagine two less serious convictions accounting for 3 criminal history points.  Mr. Sarkisyan didn't hurt anyone, steal anything, traffic drugs, or commit fraud.  He solicited a prostitute and yelled at his wife.  While not honorable acts, in no way do these convictions show the beginnings of a criminal lifestyle, nor does the current conviction represent a steadily more serious criminality.  It was a young man behaving recklessly while dealing with the stress of a new marriage and infant.  As the attached letters clearly demonstrate (including the letter from his ex-wife), Mr. Sarkisyan has matured and is a caring and integral member of his family and community.  Because "reliable information" shows that his criminal history calculation "substantially over-represents the seriousness of" his true criminal history and "the likelihood that the defendant will commit other crimes," Mr. Sarkisyan should be sentenced as if he is a criminal history category I,

DEFENDANT'S SENTENCING MEMORANDUM

1    pursuant to U.S.S.G. §4A1.3(b)(1).

2

3                              **IV.**

4    **18 U.S.C. SECTION 3553(A) FACTORS WARRANT PROBATION OR HOME**

5                         **DETENTION**

6       Title 18 of the United States Code, section 3553(a), governs

7    sentencing. As the Supreme Court wrote in Rita v. United States,

8    127 S.Ct. 2456, 2462 (2007):

9              That provision tells the sentencing judge to consider
               (1) offense and offender characteristics; (2) the need
10             for a sentence to reflect the basic aims of sentencing,
               namely (a) "just punishment" (retribution), (b)
11             deterrence, (c) incapacitation, (d) rehabilitation; (3)
               the sentences legally available; (4) the Sentencing
12             Guidelines; (5) Sentencing Commission policy
               statements; (6) the need to avoid unwarranted
13             disparities; and (7) the need for restitution. The
               provision also tells the sentencing judge to "impose a
14             sentence sufficient, but not greater than necessary, to
               comply with" the basic aims of sentencing as set out
15             above.[Emphasis omitted.]

16      It is error to presume that the guideline sentencing range

17   is reasonable.  U.S. v. Nelson, 129 S.Ct. 890, 892 (2009).  The

18   circumstances of this offense show that Mr. Sarkisyan made an

19   ill-advised decision in a desparate attempt to recoup money that

20   was rightfully his so he could pay for his sister's cancer

21   treatments.  A sentence of probation will take into consideration

22   the exceptional circumstances of the crime and of Mr. Sarkisyan's

23   character while permitting him to continue to care for his

24   children and family.  Such a sentence will more than satisfy the

25   goals stated in 18 U.S.C. §3553(a).

26   ///

27   ///

28

                              12

**<u>3553(A) FACTORS</u>**

**1. The nature and circumstances of the offense and the history and characteristics of the defendant.**

It is clear from the letters of support and the defendant's life history that Mr. Sarkisyan is a good person of high character.  He made a bad decision out of desperation and fear that he would lose his sister.  The circumstances of the offense are that Mr. Sarkisyan sought money that was rightfully his but chose a means that was illegal and dangerous.  He was overcome with grief about his sister's possible death and was doing everything he could to try to pay for her treatment.  A sentence of probation will be consistent with a crime committed with such understandable motives.

**2. The punitive, deterrent, public safety, and rehabilitative needs for the sentence imposed.**

There is little need to punish Mr. Sarkisyan.  The victim in this case was a criminal who sought to defraud Mr. Sarkisyan and others.  He is not even cooperating with authorities for the prosecution of codefendants.  Mr. Sarkisyan committed the crime not out of anger at G.A. or for monetary gain, but in order to provide his dying sister with medical care.  He does not have criminal nature and does not need to be deterred from future crime.  The public is not in danger from him and he is, in fact, a consistent contributor to charitable organizations and his community.  He does not need rehabilitation, education, or treatment for substance abuse – Mr. Sarkisyan has never abused drugs or alcohol.

13

**DEFENDANT'S SENTENCING MEMORANDUM**

1    In short, there is nothing for the public to gain from

2    incarcerating Mr. Sarkisyan.  He is a productive member of

3    society, a small business owner, a father of three and also

4    supports the children of his now passed sister.  It is pointless

5    to compound the already tragic loss of Lilia by incarcerating her

6    brother who tried to help her.

7    **3. The kinds of sentence available.**

8    As a class C Felony, Mr. Sarkisyan is eligible for

9    probation.  He has been evaluated and found a good candidate for

10   home detention.

11   **4. The Guidelines sentencing range.**

12   The Sentencing Range for Offense Level 15 for a category I

13   criminal history is 18-24 months imprisonment.  The court may

14   sentence Mr. Sarkisyan to home detention for that time.

15   **6. The need to avoid unwarranted sentence disparities.**

16   As the Court is likely aware, this large case with many co-

17   defendants contains some very serious charges and some very

18   undesireable people.  Mr. Sarkisyan knew some of these people,

19   but was not in the business of committing crimes.  He ran his

20   business and cared from his family and stayed out of trouble.

21   That he sucumbed to the cliche that "desperate times call for

22   desperate measures" does not make him a part of Armenian Power.

23   It is not at all uncommon for cases such as Mr. Sarkisyan, law

24   abiding people with families to support who make a mistake under

25   severe emotional distress, to grant probation and permit them to

26   move on with rebuilding their lives.  This is one such case and a

27   sentence of probation would not be disparate with like situated

28

14

**DEFENDANT'S SENTENCING MEMORANDUM**

defendants.

**7. The need to provide restitution to any victims of the offense.**

The victim in this case is not owed restitution.

**V.**

**CONCLUSION**

Based on the foregoing, defendant Tigran Sarkisyan requests
a sentence of probation, or, in the alternative, home detention.

DATED: February 10, 2014          KAPLAN KENEGOS & KADIN


                                  By: /s/Jerry Kaplan
                                  JERRY KAPLAN
                                  Attorneys for Defendant
                                  TIGRAN SARKISYAN

**DEFENDANT'S SENTENCING MEMORANDUM**